Floyd Edward ROGERS, Jr., Appellant

v.

The STATE of Texas, Appellee.

No. 12–04–00094–CR.

Court of Appeals of Texas, Tyler.

Dec. 30, 2005.

Robert F. Vititow, for The State of Texas.

Panel consisted of WORTHEN, C.J., GRIFFITH, J., and DeVASTO, J.

## OPINION

JAMES T. WORTHEN, Chief Justice.

A jury convicted Appellant Floyd Edward Rogers, Jr. of first degree felony murder and assessed punishment at life imprisonment. In three issues, Appellant complains about evidence admitted over his objection, fundamental error on evidence admitted without his objection, and ineffective assistance of counsel. We affirm.

### BACKGROUND

On Monday, May 26, 2003, Appellant borrowed a double barrel shotgun from a neighbor. The next day his wife of seventeen years, Tracie Lee Rogers (the "victim"), filed for a divorce. Shortly after midnight on Wednesday, May 28, Appellant fired three shots from the borrowed double barrel shotgun into the victim's thigh, chest, and face. He then left her to die in a doorway of the couple's home. After the shooting, Appellant gathered together the couple's fourteen year old daughter and six year old son, along with a seventeen year old German exchange student living with them at the time, and had them all stay in one of the bedrooms for the remainder of the night. After 8:00 a.m. that same morning, Appellant, along with the exchange student and the couple's daughter, reported the murder in person to the Rains County Sheriff's Department in Emory.

Philip N. Smith, for Floyd Edward Rogers.

Appellant was indicted for first degree felony murder. The jury found him guilty

and sentenced him to life imprisonment. Appellant timely appealed the conviction and sentence to this court.

## EVIDENTIARY ISSUES

In his first issue, Appellant complains of six offers of evidence, which he contends were improperly admitted by the trial court over his objection. We will discuss each of Appellant's arguments in turn.

### Standard of Review

■ We review the trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Green v. State*, 934 S.W.2d 92, 101–02 (Tex.Crim. App.1996). The test for abuse of discretion is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action; rather, it is a question of whether the court acted without reference to any guiding rules or principles. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.Crim.App. 1991) (op. on reh'g). The mere fact that a trial court may decide a matter within its discretionary authority differently than an appellate court does not demonstrate such an abuse. *Id.* We will not reverse a trial court's ruling on the admission of evidence as long as the ruling is within the zone of reasonable disagreement. *Id.*

### Proposed Affidavits

The victim worked as a legal assistant for a Greenville attorney, Holly Gotcher, until November 2002. Gotcher testified that the victim maintained her own personal file in an office computer while working in her office. Gotcher testified that after the victim's death, she went into this personal file and found two documents that were admitted as State's Exhibits 1A and 1B in the trial. Exhibit 1A stated in its entirety as follows:

No. _____

**TRACIE LEE ROGERS**

AND

**FLOYD EDWARD ROGERS, JR.**

IN THE DISTRICT COURT

354TH JUDICIAL DISTRICT

RAINS COUNTY, TEXAS

**SUPPORTING AFFIDAVIT**

STATE OF TEXAS

COUNTY OF HUNT

BEFORE ME, the undersigned Notary Public, on this day personally appeared Tracie Lee Rogers, Affiant, who on her oath deposed and stated as follows:

"My name is Tracie Lee Rogers. I am over the age of eighteen (18) years and capable of making this affidavit.

"I am married to Floyd Edward Rogers, Jr. Floyd Edward Rogers has committed family violence when learning that Affiant had filed for divorce.

"On May 15, 2002 at approximately 12:30 a.m., Floyd Edward Rogers, Jr. physically threw me into the floor, pried my legs apart and sexually forced himself upon me. This event left bruises on my legs arms and chest area. Affiant has photographs which clearly show said bruises and a doctor's report to corroborate the assault.

"Further, on May 15, 2002, Floyd Edward Rogers, Jr. choked me with his bare hands.

"Additionally, he has threatened to kill our entire family before he would allow us to be separated.

"On May 15, 2002, he was admitted to the hospital with chest pain but refused treatment, pulling the various devices away and signed a release releasing the

hospital from further liability because he was acting against medical advice.

"On May 15, 2002, Floyd Edward Rogers, Jr. attempted to commit suicide.

"I am afraid for my life and the life of my children."

FURTHER AFFIANT SAITH NOT.

_____
Tracie L. Rogers
Affiant

SUBSCRIBED AND SWORN TO BEFORE ME on this the ____ day of May 2002 to certify which witness my hand and official seal of office.

_____
Notary Public, State of Texas

Exhibit 1B stated in its entirety as follows:

No. _____

TRACIE LEE ROGERS
AND
FLOYD EDWARD ROGERS, JR.
AND IN THE INTEREST OF
AMANDA CHRISTINE ROGERS AND
FLOYD EDWARD ROGERS, III
MINOR CHILDREN

IN THE DISTRICT COURT
8TH JUDICIAL DISTRICT
RAINS COUNTY, TEXAS

SUPPORTING AFFIDAVIT

STATE OF TEXAS

COUNTY OF HUNT

BEFORE ME, the undersigned Notary Public, on this day personally appeared Tracie Lee Rogers, Affiant, who on her oath deposed and stated as follows:

"My name is Tracie Lee Rogers. I am over the age of eighteen (18) years and capable of making this affidavit.

"I am married to Floyd Edward Rogers, Jr. Floyd Edward Rogers, Jr. has committed family violence on several occasions in the past and Affiant fears that when learning that Affiant has filed for a protective order, Floyd Edward Rogers, Jr. will further commit family violence.

"Floyd Edward Rogers, Jr. has a significant history of committing family violence. Further, Floyd Edward Rogers, Jr. reacts emotionally and irrationally when confronted with the issue of possibly being separated from Affiant or his children.

"Specifically, on Wednesday, August 28, 2002, Respondent became enraged and committed family violence against Affiant when confronted with the possibility of being divorced. He pushed Affiant and grabbed her about the arms causing pain.

"On Sunday, September 1, 2002, Respondent again became enraged when confronted with the possibility of divorce and pulled an earring out of Affiant's ear and hit Affiant with his fist on the right buttock. Affiant was sore for several days after the assault was perpetrated.

"Respondent suffers from paranoia and is very controlling. Respondent constantly sleuths around after Affiant, wanting to know Affiant's whereabouts at all times, he searches through Affiant's vehicle, constantly accuses Affiant of having affairs with various men, and refuses to allow Affiant to leave when an argument ensues over Respondent's behavior.

"On Wednesday, September 18, 2002, Respondent was upset and paranoid about Affiant attending a continuing legal education seminar in Dallas. Respondent accused Affiant of not attend-

ing the seminar and of meeting a man at a motel. Respondent made several off-color remarks about Affiant and then, after returning home from Church, requested that Affiant come outside to visit with him about the deteriorating marriage because Affiant refused to discuss it in the presence of the children. After going outside, Respondent became enraged when Affiant told him that she didn't love him or want to be married to him and threw his glass of coke against the house and then threw his glass over the fence. Respondent grabbed Affiant's hair and pulled her neck with all of his strength. Respondent then hit himself in the head repeatedly with his fist. Affiant advised that she was going to call the police and then Respondent called his mother to see if he could come and stay with her for the evening. She refused according to the Respondent. He was then further upset, emotional and out of control and advised that if the police were called, he would relate that Affiant had assaulted the Respondent. Affiant did not, at any time, hit or threaten to hit the Respondent. However, Affiant did not call the police because she was fearful that the police would believe Respondent's lies and innuendo.

"Subsequently, Affiant took her keys and went out the front door, intending to go into the garage, secure her vehicle and leave the premises. However, Respondent locked the Affiant out of the home in only her nightshirt and underwear. He used the young son of the parties as a tool to get Affiant to return to the home and promised that he would leave Affiant alone for the rest of the evening. Respondent did not keep his word.

"Further, Respondent is obsessed with Affiant's employment and has de-manded, on numerous occasions, that Affiant quit the job with no notice to her employer. Respondent has become obsessed with his religious beliefs and has convinced himself that Affiant should leave her employment because she deals with the subject of divorce. Respondent is irrational with this request because Affiant contributes significantly to the upkeep and maintenance of the community estate and carries insurance on the children the subject of this suit. Respondent constantly berates Affiant regarding her place of employment and insists that "all lawyers are going to hell."

"Additionally, Respondent has, on several occasions, threatened to kill the entire family before he would allow the family to be separated.

"Further, Affiant believes that Respondent may react in other ways when learning that Affiant has filed an application for a protective order. In May of 2000, Floyd Edward Rogers, Jr. attempted to commit suicide when confronted with Affiant requesting a divorce.

"Affiant believes that Respondent is dangerous, out of control and that his ungovernable temper causes a threat to Affiant as well as the children the subject of this matter. Affiant has no other remedy except to seek a protective order."

_____

Tracie L. Rogers

SUBSCRIBED AND SWORN TO BEFORE ME on this the _____ day of September, 2002 to certify which witness my had and official seal of office.

_____

Notary Public, State of Texas

Neither of these two documents were ever signed, notarized, or introduced in any prior court proceeding. Appellant objected to the admission of these two documents by first stating they were both hearsay. Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Tex.R. Evid. 801(d).

During the trial and in its brief, the State contended that these two documents were admissible under the "then existing mental, emotional or physical condition" hearsay exception. This exception provides for admission of

> [a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

Tex.R. Evid. 803(3).

■■■ The State also asked the court to consider the following provision of the Texas Code of Criminal Procedure:

> In all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.

Tex.Code Crim. Proc. Ann. art. 38.36(a) (Vernon 2005). However, this statute "in no way broadens or otherwise affects the rules of evidence which apply, or the *way* in which they apply in any given homicide case." *Bush v. State,* 958 S.W.2d 503, 505 (Tex.App.-Fort Worth 1997, no pet.) (quoting *Fielder v. State,* 756 S.W.2d 309, 318 (Tex.Crim.App.1988)). The State therefore had the burden to show that these two documents qualified under the state of mind exception to the hearsay rule. A statement of memory or belief does not establish the state of mind exception to the hearsay rule. *See Gibbs v. State,* 819 S.W.2d 821, 837 (Tex.Crim.App.1991). A statement is inadmissible hearsay when it is not limited to a declarant's state of mind (fear), but explains the reason for the declarant's alleged fear. *See Barnum v. State,* 7 S.W.3d 782, 790 (Tex.App.-Amarillo 1999, pet. ref'd). A statement or document that only implies the declarant's state of mind does not come within the state of mind exception to the hearsay rule. *See id.*

■ All of the statements in the above two documents are either a statement of memory or belief by the victim. Consequently, the documents do not fall within the state of mind exception to the hearsay rule and were erroneously admitted into evidence. However, our review of the hearsay issue does not end here. A nonconstitutional error that does not affect substantial rights must be disregarded. Tex.R.App. P. 44.2(b). Substantial rights are not affected by the erroneous admission of evidence if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect. *Solomon v. State,* 49 S.W.3d 356, 365 (Tex. Crim.App.2001). For example, if the same or similar evidence was introduced through other witnesses or documents, we may determine that the erroneously admitted evidence did not have a substantial or

injurious effect on the jury's verdict and did not affect Appellant's substantial rights. *See Franks v. State,* 90 S.W.3d 771, 805–06 (Tex.App.-Fort Worth 2002, no pet.); *Couchman v. State,* 3 S.W.3d 155, 161 (Tex.App.-Fort Worth 1999, pet. ref'd). Therefore, we will review the other evidence properly admitted by the trial court regarding these facts.

▪ The purpose of these two documents was to establish the victim's ongoing relationship with Appellant and why she was "afraid for my life and the life of my children." Gotcher testified that Appellant had threatened to kill the victim and had hit her, causing bruises on numerous occasions. She also testified that during her career practicing law, she had represented hundreds of spouses in family violence situations. She described the relationship between Appellant and victim as one of love/hate. She testified that when their relationship was bad, it was very, very bad. In explaining further, she said she knew that when the victim wore certain articles of clothing to the office, she was hiding bruises that were the result of Appellant's violent acts.

Sylvia Ishmael worked for Gotcher at the same time the victim did. She described the relationship between the victim and Appellant as one of love and war. Ishmael stated that during the war (or hate) part of the relationship, the victim acted as though she felt she was being hunted by Appellant. Ishmael further stated that one time Appellant came into their office and began arguing with the victim. Ishmael described Appellant as very upset and testified that he said he "could take care of everything and that he would just take care of the whole office with his Smith & Wesson." She also testified that the victim would wear specific items of clothing in order to hide bruises that she had received from Appellant.

Steve Watkins, the attorney for whom the victim was working at the time of her death, stated that the victim was stressed because of problems with her marriage. Watkins testified that Appellant was very controlling in his relationship with the victim. Watkins also testified that, just before her death, he loaned the victim money to spend two nights away from Appellant with their children because of her fear for their safety. The victim told Watkins how quiet and peaceful it was when she was away from Appellant.

Other evidence that was before the jury and similar to the evidence in State's Exhibits 1A and 1B includes applications for protective orders filed in 1992 and 1998. In the 1992 application, the victim stated the following:

Respondent [Appellant] has engaged in conduct that constitutes family violence, as follows:

On or about December 2, 1992, Respondent threatened to kill Applicant [Victim] with a knife. Respondent threatened to go buy a Smith & Wesson and kill everyone at Applicant's place of employment located at 2610 Stonewall Street, Greenville, Hunt County, Texas. Respondent grabbed Applicant by the hair of Applicant's head and pushed Applicant down onto the floor and attempted to strangle Applicant. Respondent knocked several holes in the wall of Respondent and Applicant's house. Further, Respondent has previously threatened to kill Applicant on numerous occasions.

These acts were intended to result in physical harm, bodily injury, or assault or were threats that reasonably placed

TRACIE LEE ROGERS in fear of imminent physical harm, bodily injury, or assault and therefore constitute family violence.

In supporting documentation filed with an application for a protective order in 1998, the victim submitted the following affidavit with her application for a protective order:

(Style Omitted)

### SUPPORTING AFFIDAVIT

STATE OF TEXAS

COUNTY OF HUNT

BEFORE ME, the undersigned Notary Public, on this day personally appeared Tracie Lee Rogers, Affiant, who on her oath deposed and stated as follows:

"My name is Tracie Lee Rogers. I am over the age of eighteen (18) years and capable of making this affidavit.

"I am married to Floyd Edward Rogers, Jr. Floyd Edward Rogers, Jr. has committed family violence.

"On Sunday, November 4, 1998 at approximately 12:30 a.m., Floyd Edward Rogers, Jr. physically threw me into the floor pried my legs apart and sexually forced himself upon me. This event left bruises on my legs, arms and chest area.

"Further, on Sunday, November 4, 1998, Floyd Edward Rogers, Jr. choked me with his bare hands.

"Additionally, he has threatened to kill our entire family before he would allow us to be separated.

"On November 5, 1998, he was admitted to the hospital with chest pain but refused treatment, pulling the various devices away and signed a release releasing the hospital from further liability because he was acting against medical advice.

"On November 6, 1998, Floyd Edward Rogers, Jr. committed [sic] suicide.

"I am afraid for my life and life [sic] of my children."

FURTHER AFFIANT SAITH NOT.

/s/ _____
Tracie L. Rogers
Affiant

The above-described testimony and documents are the same as or similar to State's Exhibits 1A and 1B. Based upon our examination of this same or similar evidence, we can have a reasonable assurance that the two documents at issue either did not influence the jury or had but a slight effect. *See Franks*, 90 S.W.3d at 805–06.

■ Appellant further contends that these two documents should have been excluded under Texas Rule of Evidence 403. Pursuant to Rule 403, extraneous offense evidence that is relevant beyond character conformity is presumed admissible, but is subject to exclusion if the opponent of the evidence timely objects on the basis that the danger of unfair prejudice substantially outweighs its probative value. *Montgomery*, 810 S.W.2d at 389. There must be a marked disparity between the degree of prejudice of the evidence and its probative value before the Rule 403 balancing test requires exclusion. *Jones v. State*, 944 S.W.2d 642, 652 (Tex.Crim.App. 1996).

■ We must measure the trial court's ruling against the relevant criteria by which a Rule 403 decision is to be made. *Montgomery*, 810 S.W.2d at 392. A Rule 403 analysis by the trial court should in-

clude, but is not limited to, the following factors: (1) the probative value of the evidence; (2) the potential of the evidence to impress the jury in some irrational but nevertheless indelible way; (3) the time the proponent needs to develop the evidence; and (4) the proponent's need for the evidence. *Erazo v. State*, 144 S.W.3d 487, 489 (Tex.Crim.App.2004) (citing *Montgomery*, 810 S.W.2d at 389–90).

In reviewing the evidence in these two documents, we see the issue of intent, which was raised by Appellant, addressed in a compelling way making it highly probative for the jury. In its indictment, the State accused Appellant of "intentionally or knowingly causing the death" of the victim. A person commits the offense of murder if he intentionally or knowingly causes the death of an individual or, with the intent to cause serious bodily harm, he commits an act clearly dangerous to human life that causes the death of an individual. TEX. PEN.CODE ANN. § 19.02(b) (Vernon 2003). In his opening argument and in evidence that he presented, Appellant raised the issue of accident stating that he and the victim were struggling over the shotgun when it went off. Amanda Rogers, the fourteen year old daughter of Appellant and the victim, also testified about a struggle between the two that led to the unintentional discharge of the shotgun.

This evidence also illustrates the ongoing relationship between Appellant and the victim. It shows the relationship was spiraling downward in the year before the shooting. These are relevant facts needed by the jury to assess the condition of Appellant's mind and his actions that led to the victim's death. *See* TEX.CODE CRIM. PROC. ANN. art. 38.36(a).

We have set out above the testimony of three witnesses who described the nature of the relationship between Appellant and the victim. The exchange student living in the Rogers's home also testified about the nature of that relationship. Additionally, other documents before the jury contain facts similar to those in State's Exhibits 1A and 1B. The potential for State's Exhibits 1A and 1B to impress the jury in some irrational way is minimal.

The portion of the reporter's record containing testimony by the State's witnesses in the guilt/innocence phase is under 400 pages in length. The State presented sixty-two exhibits during this phase. Gotcher read the two affidavits to the jury during her testimony. The State spent a short amount of time presenting this evidence and its presentation did not divert the jury from consideration of the indicted offense.

Appellant wanted the jury to believe the shooting was an accident. The State needed this evidence to show the State's allegation of murder is a credible one in light of Appellant's history. It shows Appellant was unstable and violent and that he had threatened to kill his entire family rather than get a divorce. This makes Appellant's accident theory less likely.

We cannot say that the court's determination that the evidence was more probative than prejudicial is outside the zone of reasonable disagreement. *See Erazo*, 144 S.W.3d at 489. Therefore, we cannot conclude that the trial judge abused his discretion in admitting State's Exhibits 1A and 1B into evidence.

*"If I can't have you, no one can."*

■ Next, Appellant complains of Gotcher's testimony that the victim had told her that Appellant had said "If I can't have you, no one can." Appellant raised a hearsay objection to this statement. The court admitted the evidence under the

state of mind exception. In a prosecution for murder, evidence of prior assaults on and threats toward the victim by the defendant is relevant to show the defendant's previous relationship with the victim as well as the defendant's state of mind at the time of the offense. *Pena v. State*, 864 S.W.2d 147, 150 (Tex.App.-Waco 1993, no pet.). The trial court did not abuse its discretion in allowing this statement by Gotcher into evidence.

### *"He doesn't believe me."*

■ Appellant next contends that a tape recorded phone message made by the victim was inadmissible hearsay. Shortly before her death, the victim had attempted to call Judy Tarpley, the administrator of a retirement plan in which the victim participated. Because Tarpley was on vacation, she left a message. Tarpley did not return to her office until after the victim's death. Tarpley described the victim's voice in the phone message as being "very pleading" and "very upset." In the message, the victim asked Tarpley at least twice to please call her husband and explain to him that she would eventually become entitled to the money in her retirement plan because "he doesn't believe me." When a statement shows the declarant's existing state of mind, such as fear, it falls within the Rule 803(3) hearsay exception. *See Martinez v. State*, 17 S.W.3d 677, 689 (Tex.Crim.App.2000). This statement not only shows the victim's state of mind, but also establishes Appellant's state of mind, indicating that he was suspicious of the victim's motives regarding the divorce proceeding. It was therefore admissible evidence.

### *Victim's phone message for attorney*

■ The State offered as evidence the following phone message left by the victim

for her attorney and boss, Steve Watkins, on the Saturday (May 24) before her death:

TRACIE ROGERS: Steve, this is Tracie. It is about 12:48 on Saturday. I am at the office. I need to run something by you and see if you think this is good or bad, and then just give me a call and let me know. Things have escalated between Eddie and myself to a point where last evening he threatened to kill himself, or kill me and himself, and at one point he was even going to kill you.

And so I came up here to the office today under a guise just to get away—he's at work—and to let our kids kind of cool off because he's doing all this in front of them. He hit himself in the head with a dumbbell.

It is not my intention to have ever done anything this way, but now when confronted with the paperwork, he—he threatened suicide. And, you know, he tried in 2000. And I contacted Glen Oaks and asked them what to do. I asked him to go there and get some help, but he won't go.

And they suggested that I go down to the police station and ask for an emergency involuntary commitment and let them come pick him up and assess him. Since it is a holiday weekend, he would be in until Tuesday before he could get out. I know that before when they did this to him, they let him out, and then he tried to commit suicide in a couple of days. And so I don't know if that's a viable thing to do or not.

He's at work, so he'd be picked up by the Greenville police. It wouldn't have to happen at the house. He's there till 4:00 o'clock. I don't want to do anything like that without talking to you

first. So if you're comfortable talking to me about it, just leave me a voice mail, and I'll check it. I'm going to be here for just a little bit, and then I'm going to go home to my kids.

Thank you. Bye-bye.

Appellant lodged a Rule 403 objection to this evidence. The victim left this message four days before the murder took place. It helps the jury understand Appellant's state of mind as well as the deteriorating relationship between Appellant and the victim. Because of the insight this evidence provided into the ongoing relationship and Appellant's intentions, the evidence was more probative than prejudicial, and the trial court did not abuse its discretion in admitting it into evidence. *See Montgomery,* 810 S.W.2d at 392–93.

■■■■■ Appellant also contends that the introduction of this phone message into evidence violated his right to confront the witnesses against him as guaranteed by the Sixth Amendment of the United States Constitution and article I, section 10 of the Texas Constitution.[1]

The United States Supreme Court addressed the confrontation issue last year in *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). In *Crawford,* Justice Antonin Scalia wrote "Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually pre-

scribes: confrontation." *Id.,* 541 U.S. at 68–69, 124 S.Ct. at 1374. While declining to provide a comprehensive definition of "testimonial," the Court held that the term applies, at a minimum, to prior testimony at a preliminary hearing, before a grand jury, or at a formal trial and to police interrogations. *Id.,* 541 U.S. at 68, 124 S.Ct. at 1374. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed. *Id.* These examples all involve state action. It is clear to us that a tape recorded message left by a client for her attorney (or an employee for her employer) regarding a civil suit does not fit into any of these categories, is not testimonial, and does not involve state action. Therefore, this taped phone message does not implicate Appellant's Sixth Amendment right to confrontation of a witness.

This leaves us with Appellant's hearsay objection to this taped phone message. The State again responded to the hearsay objection arguing that it should be admitted under the Rule 803(3) exception in that it showed the victim's state of mind four days prior to her murder. We agree that the first two paragraphs describe the victim's state of mind and are therefore admissible evidence. *See Pena,* 864 S.W.2d at 150. They are also admissible because they show Appellant's state of mind as to the deteriorating relationship leading up to the murder. *See* TEX.CODE CRIM. PROC. ANN. art. 38.36(a).

■■■■ We agree with Appellant's contention that the remainder of the phone mes-

---

1. We note that Appellant does not separately argue his state and federal constitutional claims or argue that the Texas constitutional protections differ in any significant way from those protections or rights in the United States Constitution. To adequately brief a state constitutional issue, Appellant must proffer specific arguments and authorities supporting his contentions under the state constitution. *Moore v. State,* 935 S.W.2d 124, 128 (Tex.Crim.App.1996); *Lawton v. State,* 913 S.W.2d 542, 558 (Tex.Crim.App.1995). Because Appellant failed to do so, we consider Appellant's confrontation issue as a federal constitutional claim only. *See Jackson v. State,* 992 S.W.2d 469, 475 n. 8 (Tex.Crim. App.1999); *Johnson v. State,* 853 S.W.2d 527, 533 (Tex.Crim.App.1992).

sage was inadmissible hearsay because it did not involve the state of mind of either the victim or Appellant. However, when an exhibit contains both admissible and inadmissible material, the objection must specifically refer to the material that is objectionable. *Williams v. State*, 927 S.W.2d 752, 760 (Tex.App.-El Paso 1996, pet. ref'd). If the party who objects to an exhibit does not specify which part of the exhibit is not admissible, any error in admitting the exhibit is not preserved for review. *Id.* (citing *Brown v. State*, 692 S.W.2d 497, 501 (Tex.Crim.App.1985)). Here, the Appellant did not specify for the trial court which portions of the taped telephone message made by the victim were inadmissible and has therefore waived this complaint on appeal. *See* Tex. R.App. P. 33.1.

### *Statement of Relief by Victim*

 Appellant next complains of a portion of Steve Watkins's testimony. Watkins testified that on Tuesday, the day the victim filed for divorce from Appellant, "she was relieved because she had talked with Eddie and they had reached an agreement." Appellant contends that this is a hearsay statement and cannot be admitted. The State again asserts that the statement can be admitted because it shows the victim's state of mind as to her relationship with Appellant less than twenty-four hours before he murdered her. We agree with the State. Evidence of the previous relationship between the victim and Appellant and the state of mind of each at the time of the offense may be admitted under the state of mind exception to the hearsay rule. *See Pena*, 864 S.W.2d

at 150; *see also* Tex.Code Crim. Proc. Ann. art. 38.36(a). This statement of relief shows why the victim would have agreed to spend the night in the same house with Appellant less than twenty-four hours after filing for divorce.

Having concluded that the six objected-to pieces of evidence are either admissible, that the error in admitting them was harmless, or that Appellant waived his complaint, we overrule Appellant's issue one.

### *Admission of Evidence as Fundamental Error*

 In his second issue, Appellant complains of the admission of a 1992 application for a protective order and a temporary ex parte protective order signed by the trial court. Appellant contends that even though he did not object to this evidence, its admission was fundamental error in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the due course of law provision of the Texas Constitution. Appellant contends that he was not represented by an attorney or present to defend himself when the 1992 temporary restraining order was entered. Further, he argues that the order had become void by its own terms fourteen days [2] after its entry by the court since no hearing was held, and the State cannot use a void judgment against him.

In support of this contention, Appellant cites the opinion of the United States Supreme Court in *Loper v. Beto*, 405 U.S. 473, 92 S.Ct. 1014, 31 L.Ed.2d 374 (1972). In *Loper*, the Supreme Court determined

---

**2.** The order states it is effective for twenty days unless terminated sooner by order of the court.

that convictions obtained when the defendant was not represented by counsel were void, and use of those convictions for impeachment purposes would deprive a defendant of due process. *Id.*, 405 U.S. at 483, 92 S.Ct. at 1019. Appellant argues that the use of the sworn pleadings and temporary restraining order here amounts to the same as the use of a void conviction in *Loper.*

Title 4 of the Family Code was enacted as an attempt to address the problem of family violence. The law gives a prompt, efficient way to obtain a court order prohibiting violence in a family setting without the necessity of instituting divorce proceedings. *Striedel v. Striedel,* 15 S.W.3d 163, 165 (Tex.App.-Corpus Christi 2000, no pet.). A court may issue a temporary ex parte order if it finds a clear and present danger of family violence evidenced in the application. TEX. FAM.CODE ANN. § 83.001 (Vernon 2002). A temporary ex parte order is valid for up to twenty days. TEX. FAM.CODE ANN. § 83.002 (Vernon 2002).

▮▮▮ Ordinarily, general principles of due process dictate that a litigant has a right to be heard and that the court must protect that right. *Striedel,* 15 S.W.3d at 166. Emergency situations present an exception. *See Ex parte Flores,* 130 S.W.3d 100, 106–07 (Tex.App.-El Paso 2003, pet. ref'd). The temporary and emergency nature of emergency protective orders allows them to pass constitutional muster. *Page v. Sherrill,* 415 S.W.2d 642, 646 (Tex.1967) (orig. proceeding); *Ex parte Flores,* 130 S.W.3d at 107. *See also Smith v. Texas Discount Co.,* 408 S.W.2d 804, 806 (Tex. Civ.App.-Austin 1966, no writ) (There is no right of cross-examination involved in an ex parte proceeding.). The 1992 order provided that it would be in effect for twenty days at most and set a date for a hearing to determine whether a protective order should issue. Further, the Texas Supreme Court has never held that a civil litigant must be represented by counsel in order for a court to conduct its fundamental, constitutional function. *Travelers Indem. Co. v. Mayfield,* 923 S.W.2d 590, 594 (Tex.1996) (orig. proceeding).

We further note in the instant case that the victim obtained a temporary restraining order in 1991 and another in 1998. Appellant did not have legal counsel when either of these orders were entered. These two restraining orders, along with the victim's applications for these restraining orders, contain allegations similar to those supporting the 1992 temporary restraining order complained of by Appellant under this issue. We fail to see how the admission of the 1992 application for temporary restraining order and temporary restraining order could have been fundamental error when other restraining order evidence with similar facts was before the jury and not complained about on appeal. *See* TEX.R.APP. P. 33.1(a). Appellant's issue two is overruled.

### INEFFECTIVE ASSISTANCE OF COUNSEL

In his third issue, Appellant contends he was denied effective assistance of counsel. He contends that his attorney was ineffective because he did not object to the introduction of results of a psychological test which his psychologist, Dr. Thomas Allen, administered to him or to the prosecutor's jury argument based on that evidence. Secondly, he contends that his counsel was ineffective when he did not object to the testimony of Watkins, who had been a law partner of Appellant's 1991 divorce attorney.

In order to prevail on an ineffective assistance of counsel claim, Appellant must

show that the performance of his attorney fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 687–88, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). He must also show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*, 466 U.S. at 694, 104 S.Ct. at 2068. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the proceeding. *Id.*; *Hernandez v. State*, 726 S.W.2d 53, 55 (Tex.Crim.App.1986). In evaluating the effectiveness of counsel, the reviewing court looks to the totality of the representation and the particular circumstances of each case. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex.Crim.App.1999). The appellant has the burden of proving ineffective assistance of counsel by a preponderance of the evidence. *Moore v. State*, 694 S.W.2d 528, 531 (Tex.Crim.App.1985). The record must affirmatively demonstrate the alleged ineffective assistance. *McFarland v. State*, 928 S.W.2d 482, 500 (Tex.Crim.App.1996). Under normal circumstances, the record on direct appeal will not be sufficient to show that counsel's representation was so deficient and so lacking in tactical or strategic decision-making as to overcome the presumption that counsel's conduct was reasonable and professional. *Bone v. State*, 77 S.W.3d 828, 833 (Tex.Crim.App.2002).

Appellant contends that the "L" part of the psychological examination which he was given by Dr. Allen correlated to a polygraph test and therefore his attorney should have objected to its admission into evidence. Dr. Allen specifically testified that the psychological test he administered to Appellant was the Minnesota Multiphasic Personality Inventory II ("MMPI II"). Dr. Allen testified that the MMPI II,

which he administered to Appellant, was not the same as the previous MMPI I. He said that although the letter "L" stands for "lie" and its use was continued under the MMPI II, it did not mean the same thing that it had meant under the MMPI I. He said that the "L" part of the MMPI II did not involve whether Appellant was telling the truth or not, but whether Appellant was defensive or not. He specifically stated that "it cannot be characterized as a polygraph examination." The record therefore does not support the allegation upon which Appellant bases this portion of his ineffective assistance claim.

■ In jury argument, it is permissible for the prosecutor to make reasonable deductions from the evidence. *Gaddis v. State*, 753 S.W.2d 396, 398 (Tex. Crim.App.1988). Counsel is allowed wide latitude in drawing inferences from the evidence so long as they are fair, legitimate, and offered in good faith. *Id.* Counsel may infer from the evidence that a defendant has lied. *Juhasz v. State*, 827 S.W.2d 397, 404 (Tex.App.-Corpus Christi 1992, pet. ref'd). Because the complained-of argument was not improper, defense counsel could not have been ineffective for failing to object to it.

■ Appellant's claim that counsel was ineffective because Watkins was a law partner of Appellant's divorce attorney in 1991 is not supported by the record. In cases where the appellant is claiming ineffective assistance due to a conflict of interest, an actual conflict must be shown. *Talbott v. State*, 93 S.W.3d 521, 524 (Tex.App.-Houston [14th Dist.] 2002, no pet.). Here, Appellant did not establish on the record that there was any conflict between Watkins and Appellant's former attorney. An appearance of a conflict involving the Tex-

as Disciplinary Rules of Professional Conduct is not enough to establish attorney misconduct. *See Keen v. State,* 85 S.W.3d 405, 411 (Tex.App.-Tyler 2002, pet. ref'd). Further, there is nothing in the record showing that Appellant raised Watkins's possible conflict with his trial counsel, thus putting trial counsel on notice of an alleged conflict.

Appellant has failed to show that his claims of ineffective assistance of counsel are supported by the record before us. Appellant's issue three is overruled.

### DISPOSITION

Having overruled Appellant's three issues, we *affirm* the judgment of the trial court.