Opinion issued July 10, 2008







 

 









In The

Court of Appeals

For The

First District of Texas

____________


NO. 01-07-00111-CR

____________


LOWELL KENT STEVENS, Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from the 177th District Court

Harris County, Texas

Trial Court Cause No. 1074898






MEMORANDUM OPINION

 

 A jury convicted appellant, Lowell Kent Stevens, of murder. See Tex. Penal
Code Ann. § 19.02(b)(1), (b)(2) (Vernon 2003). The indictment contained two
enhancement paragraphs including Stevens's previous convictions for felony
possession of marihuana and aggravated assault. Stevens pled not guilty, and trial
was held before a jury. The jury found Stevens guilty and assessed Stevens's
punishment at confinement for life in the Texas Department of Criminal Justice-- 
Institutional Division. 

 In seven points of error, Stevens contends that: (1) the trial court erred in
excluding Stevens's evidence of an alternative perpetrator which violated Stevens's
right to due process; (2) the trial court abused its discretion by excluding Stevens's
evidence of an alternative perpetrator; (3) the trial court abused its discretion by
shackling Stevens during trial; (4) the prosecutor engaged in misconduct by
deliberately misstating certain evidence; (5) the evidence is legally insufficient to
sustain his conviction; (6) the evidence is factually insufficient to sustain his
conviction; and (7) trial counsel rendered ineffective assistance of counsel.

 We affirm.

I. Factual Background Harold Parmelee lived with his mother, Linda Baird, (1) at 2128 Parker Road in
Houston. Parmelee and Baird met the complainant, Gary Owens, who was living out
of his van at the time. Baird agreed to let Owens rent space in the garage of her
house. Owens was to pay Baird with his social security check since he had recently
completed his paperwork for benefits.

 Stevens lived with his invalid wife, Jackie, (2) in a shack attached to the back of
the Sonny's convenience store a block down the street from Baird's house. Parmelee
met Stevens shortly before this offense occurred. 

 Around 8:30 a.m. on June 28, 2005, a City of Houston employee found
Owens's body in a drainage ditch on the corner of Burden and Parker streets and
reported the discovery to police. Owens's body was found about four houses from
Baird's house. 

 Three homicide officers were dispatched to the scene. They called the medical
examiner, who pronounced Owens dead. Owens had blood coming from his nose and
face, injuries to his eye and eyebrow, and injuries to his upper left forehead. His
shorts were in a twisted position and the pockets were pulled inside-out.

 The officers took a picture of Owens and canvassed the neighborhood for
anyone with information. The residents of a house next to the ditch where Owens's
body was found reported hearing a thump outside their home around 2:00 a.m. After
examining the scene, Sergeant C.E. Elliott received a call from Baird and made
arrangements to meet with her and Parmelee. 

 The next morning, Elliott showed Baird and Parmelee a photo of the victim,
whom they identified as Owens. Baird and Parmelee also gave a statement to police
implicating Stevens in Owens's death. Elliott testified that Parmelee and Baird were
cooperative and forthcoming. 

 While at the Baird residence, officers noted that there was a tree with a large
root protruding from the ground in Baird's front yard. Elliot testified that slamming
someone onto that root could cause significant internal injuries. 

 Parmelee walked Elliott down the street to show him the shack where Stevens
lived. Subsequently, Elliott obtained a warrant for Stevens's arrest. After obtaining
Stevens's permission to search his home, Elliott recovered a ball cap, a watch, a
Swiss Army knife, a cigarette lighter and a mini CD player. In his statement to
Elliott, Parmelee claimed these very items had been stolen from Owens. Elliott also
collected a pair of blue jean shorts stained with blood. 

 Sergeant Glenn Riddle arrived at Stevens's home, photographed the scene, and
collected the evidence. Elliott then returned to Baird's house, where Baird and
Parmelee identified the various items collected from Stevens's home as Owens's
property. Baird gave the officers Owens's bloody dentures and his favorite "Koozie,"
both of which she found by the tree in her front yard.

 Before the incident that led to Owens's death, the facts are generally agreed
upon. However, the events of the early morning hours of June 28, 2005, were in
dispute at Stevens's trial. We will present both versions.


A. State's Evidence

 On June 27, 2005, Stevens and his wife, Jackie, were at Baird's house washing
clothes and watching television. Parmelee testified that Stevens and his wife were
having financial problems and did not have money to wash their clothes elsewhere. 
Parmelee also told the jury that Stevens had been drinking beer all day. Parmelee had
also been drinking beer and, because he had suffered a neck injury earlier that day,
he took a muscle relaxer and went to sleep. 

 Baird, screaming and scared, woke her son up several hours later. Baird told
Parmelee that Stevens was beating up Owens in the front yard. Parmelee went to the
front door and saw Stevens lift Owens over his head and slam him to the ground near
the tree in the front yard. Holding Owens's crumpled up shirt and the crotch of his
pants, Stevens picked Owens up a second time and slammed him onto the roots of the
tree. The side of Owens's head, his ribs, his arm and his leg were getting slammed. 
Stevens slammed Owens like this two or three times and then kicked and punched
him. Owens kept yelling, "What did I do? What did I do? I didn't do anything." 

 Parmelee did not go outside because he was afraid of Stevens, and Baird held
Parmelee back because she feared for his safety. Parmelee testified that Stevens was
extremely mad and appeared to be in a "blind rage." Owens was in the fetal position
the entire time and did not attempt to defend himself. Owens weighed only 118
pounds; Stevens outweighed him by about a hundred pounds.

 Parmelee yelled out the door several times telling Stevens to stop. Parmelee
and Baird did not have a telephone, so they could not call the police. Jackie was
lying on Baird's living room floor, but she was incoherent due to her illness. 
Parmelee left the doorway and, through the window, he noticed a shadow pass by the
rear of the van in the driveway. Parmelee lay down and went back to sleep. 

 Around 2:00 a.m., Stevens appeared on the front porch of the Baird house;
Baird and Parmelee both went to the door. Stevens had blood on his hands, arms, and
chest; he was wearing a pair of jean shorts without a shirt. Stevens tried to give
Parmelee Owens' CD player, lighter, watch, and knife; Parmelee said he did not want
them. When Parmelee asked where Owens was, Stevens answered, "He's around the
corner." Stevens continued, "He got up and tried to follow me, and I knocked him
out again." After Parmelee told Stevens to leave, Parmelee and Baird put Jackie in
her wheelchair and Stevens left with her.

 Parmelee and Baird did not call police right away because they were scared to
go outside to the pay phone and because Parmelee mistakenly believed he had a
warrant out for his arrest. At 4:30 a.m., Parmelee's boss picked him up, and they
checked on a job and had breakfast. Returning home, Parmelee saw the coroner's
wagon and police at the corner of Parker and Burden. Baird then called the police
from a pay phone to report that she believed she knew the person they had found on
the street. 

 Following Parmelee's testimony, Sergeant Elliot testified that, from the
evidence, it appeared that Stevens beat Owens until he was incoherent, walked with
Owens to Burden and Parker, and left the body in the ditch. Elliott also believed that
Stevens had stomped on Owens's neck either at the scene of the initial beating or later
at the ditch. 

 Dr. Morna Gonsoulin, the assistant medical examiner, told the jury that the
cause of death was blunt force injuries to the head, neck and abdomen. Owens
suffered bleeding in the soft tissues of the scalp, inside the brain, and bruising on the
surface of his brain, caused by a force significant enough to shake the brain and
damage the vessels until they burst and caused internal bleeding. Owens also
sustained significant force from being slammed to the ground that broke vessels at the
bottom of the brain near the base of the skull. Dr. Gonsoulin testified that these
injuries were consistent with someone being slammed violently to the ground or
having their head smashed into the ground. Dr. Gonsoulin testified further that
Owens sustained a significant blow to his mouth that caused a laceration and
bleeding. She explained that the force that caused these internal injuries to the mouth
could have knocked Owens's dentures out of his mouth. Contusions on Owens's face
indicated that he sustained multiple blows; and contusions on the left side of his face
indicated that he either struck his entire face against something very hard or had
"multiple strike sites," one with great force and one with lesser force.

 Finally, Dr. Gonsoulin testified that Owens's collarbone and seven ribs were
fractured and that he had extensive injuries to his abdomen, intestines, and kidney
that had caused internal bleeding.

 Laura Gahn, the State's final witness, conducted the DNA testing in the instant
case. She testified that Parmelee's DNA was not found on the blue jean shorts and
baseball cap collected from Stevens's house, or from scrapings from Owens's
fingernails. However, the bloody shorts had Stevens's DNA on them and Owens
could not be excluded as a contributor to the DNA mixture on the shorts. Gahn told
the jury that the DNA mixture on the shorts could have been from Stevens's skin cells
and Owens's blood cells.

B. Stevens's Defense (3)

 Stevens's theory of the case was that Parmelee had caused the injuries leading
to the death of Owens. Alternatively, Stevens claimed that Owens's injuries were
sustained in an automobile accident.

 Harry Johnson, a private investigator, testified first for the defense. Johnson
interviewed Parmelee on August 15, 2005, about six weeks after Owens's death. 
Johnson testified to differences in Parmelee's interview at that time and his testimony
in court. One discrepancy was the number of body slams he observed. Parmelee told
Johnson that he saw one body slam, but at trial he testified that Stevens slammed
Owens to the ground three times.

 Melvin Moore, an inmate who had been in holdover with Parmelee, (4) testified
that Parmelee had admitted to him that Parmelee was high on "bars," or Xanax, at the
time of Owens's death. Moore testified further that Parmelee told him that he hated
Stevens and that his mother was angry with Stevens.

 Throughout the trial, Stevens's counsel attempted to show that Parmelee had
both the motive and the opportunity to murder Owens, and that Parmelee had violent
tendencies. In support of this theory, defense counsel elicited testimony from
Parmelee that Baird had called the police and made two assault allegations against 
her son prior to the Owens incident. 

 Defense counsel attempted to establish Parmelee's motive for killing Owens
by eliciting testimony from Parmelee that Owens had pushed his mother to the floor. 
Additionally, defense counsel elicited testimony from Parmelee that Owens had
stolen a bicycle and a van from his mother. Defense counsel also pointed out another
inconsistency in Parmelee's testimony. Specifically, Parmelee told Officer Sosa that
Stevens returned 35 or 45 minutes after Parmelee and Baird witnessed the beating of
Owens in the front yard, but at trial Parmelee testified that Stevens returned after two
hours. Finally, defense counsel elicited testimony that, following his death, all of
Owens's possessions ended up in the custody of Parmelee. 

II. Discussion

A. Evidence of an Alternative Perpetrator


 In his first and second points of error, Stevens claims the trial court committed
error in excluding Stevens's evidence that Parmelee was the individual responsible
for the death of Owens. Stevens claims the exclusion of this evidence violated his
right to due process and constituted an abuse of discretion because such evidence was
admissible under Rules 401, 403, 701, 802(24), and 804(b)(2) of the Texas Rules of
Evidence. See Tex. R. Evid. 401, 403, 701, 802(24), 804(b)(2).

 1. Relevant Facts

 Stevens's trial counsel attempted to introduce into evidence a telephone
answering service's message slip which read, "Harold Parmelee had something to do
with Gary's death." The message slip purported to be a call from Linda Baird, it
listed Baird's phone number, and was dated August 18, 2005. The caller was trying
to reach Harry Johnson at J.J. Grandoni & Associates, the private investigation firm
hired by Stevens. The message was taken by Rhonda Diggs, an employee of the
answering service that had taken calls for the investigation firm for 15 years.

 The prosecutor objected to the introduction of the message slip into evidence
on the grounds that it was irrelevant and constituted inadmissible hearsay. See Tex.
R. Evid. 801(d). Defense counsel countered that the message was admissible under
the business exception to the hearsay rule. See Tex. R. Evid. 803(6). To this end,
defense counsel made a proffer on the record through Diggs. Diggs testified that she
took the message for Johnson and that, during the course of the phone call, the caller
also said, "he had come in the house and pushed her around a little bit and she was
scared." The record does not indicate to whom the caller was referring. The trial court ruled that the message slip was admissible under the business
records exception to the hearsay rule, but that the content of the message was
excluded from evidence because: (1) the message was "unreliable," and (2) its
probative value was substantially outweighed by the danger of unfair prejudice. See
Tex. R. Evid. 801(d), 803(6).

 2. Did the exclusion of the evidence violate Stevens's due process
rights?


 Stevens first alleges that the exclusion of the telephone message violated his
right to due process because, without it, Stevens could not successfully present his
defense that Parmelee was the person responsible for Owens's death.

 In Texas, the improper exclusion of evidence may raise a constitutional
violation in two circumstances: (1) when an evidentiary rule categorically and
arbitrarily prohibits the defendant from offering relevant evidence that is vital to his
defense or (2) when a trial court erroneously excludes evidence that is a vital portion
of the case and the exclusion effectively precludes the defendant from presenting a
defense. Ray v. State, 178 S.W.3d 833, 835 (Tex. Crim. App. 2005) (citing Potier v.
State, 68 S.W.3d 657, 659-62 (Tex. Crim. App. 2002)). 

 However, to preserve a complaint for appellate review, a party must make a
timely, specific objection in the trial court. Tex. R. App. P. 33.1(a). A failure to
timely and specifically object waives even constitutional rights. Muniz v. State, 851
S.W.2d 238, 255 (Tex. Crim. App. 1993); Briggs v. State, 789 S.W.2d 918, 924 (Tex.
Crim. App. 1990). In the instant case, Stevens failed to assert at trial that the
exclusion of Diggs's testimony or the telephone message violated his right to due
process. Therefore, Stevens has waived review of this claim. See Muniz, 851 S.W.2d
at 255 (holding "except for complaints involving systemic (or absolute) requirements,
or rights that are waivable only . . . all other complaints, whether constitutional,
statutory or otherwise are forfeited by failure to comply with Rule 33.1(a)").

 3. Was the content of the telephone message admissible?


 Stevens next argues that the trial court abused its discretion in excluding
Diggs's testimony and the telephone message because such evidence was probative
that Parmelee, not Stevens, caused Owens's death.

 We review a trial court's decision whether to admit or exclude testimony for
abuse of discretion, and we will reverse only if the trial court abused its discretion. 
Joiner v. State, 825 S.W.2d 701, 708 (Tex. Crim. App. 1992). As long as the trial
court's evidentiary ruling is within the zone of reasonable disagreement, an appellate
court will not disturb it. Montgomery v. State, 810 S.W.2d 372, 391 (Tex. Crim. App.
1990). If the record supports the ruling, we must affirm. See Alvarado v. State, 853
S.W.2d 17, 23 (Tex. Crim. App. 1993).

 At trial, all relevant evidence is admissible unless otherwise excepted by the
Constitution, statute, or other rules. See Tex. R. Evid. 402. Evidence is relevant if
it has any tendency to make more probable or less probable the existence of a
consequential fact. Tex. R. Evid. 401; Moses v. State, 105 S.W.3d 622, 626 (Tex.
Crim. App. 2003). Not all relevant evidence is admissible. Moses, 105 S.W.3d at
626. 

 We agree with the trial court that, although relevant, the contents of the
telephone message were offered for the truth of the matter asserted and therefore
constitute inadmissible hearsay. Cf. White v. State, No. 01-04-00410-CR, 2006 WL
727809, at *7 (Tex. App.--Houston [1st Dist.] Mar. 23, 2006, pet. ref'd) (memo. op.,
not designated for publication) (holding telephone messages retrieved from murder
victim's voicemail admissible only to establish time of victim's death); Rogers v.
State, 183 S.W.3d 853, 865-66 (Tex. App.-- Tyler 2005, no pet.) (holding portions
of telephone message implicating defendant's violent tendencies toward victim
inadmissible hearsay). "Hearsay" is a statement, other than one made by the declarant
while testifying at trial, offered in evidence to prove the truth of the matter asserted. 
Tex. R. Evid. 801(d). As the trial court correctly stated, a principal reason for
excluding hearsay is because of its unreliable nature. Specifically, the veracity of the
declarant cannot be tested by cross-examination. Here, Baird died prior to trial, and
there was no way to verify whether or not she was the person who left the message. 
Therefore, we hold that the trial court's ruling to exclude Diggs's testimony and the
telephone message did not fall outside of the zone of reasonable disagreement. See
Weatherred v. State, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000). 

 Furthermore, even if the telephone message was to qualify for admission into
evidence, the trial court was free to exclude the message on Rule 403 grounds, as it
did in this case. Rule 403 provides that, "although relevant, evidence may be
excluded if its probative value is substantially outweighed by the danger of unfair
prejudice, confusion of the issues, or misleading the jury, or by considerations of
undue delay, or needless presentation of cumulative evidence." Tex. R. Evid. 403.

 As previously noted, there was no way of verifying the authenticity of the
telephone message because Baird died prior to trial. Therefore, we hold that the trial
court did not abuse its discretion in concluding that the nature of the message was so
unreliable that its probative effect was substantially outweighed by the danger of
unfair prejudice. See Tex. R. Evid. 403; Rogers v. State, 991 S.W.2d 263, 266 (Tex.
Crim. App. 1999). 

 Stevens also contends that the contents of the telephone message were
admissible under Rule 701 of the Texas Rules of Evidence, which provides that a
witness may offer testimony in the form of opinions or inferences if the testimony is
(1) rationally based on the perception of the witness and (2) helpful to a clear
understanding of his or her testimony or the determination of a fact issue. See Tex.
R. Evid. 701. Assuming without deciding that Rule 701 makes the evidence relevant, 
the content of the telephone message was inadmissible hearsay that was also properly
excluded as unduly prejudicial under Rule 403. 

 Finally, Stevens urges this court to find the contents of the telephone message
admissible under Rules 802(24) (statement against interest) and 804(b)(2) (dying
declarations) of the Texas Rules of Evidence. See Tex. R. Evid. 802(24), 804(b)(2). 
However, because Stevens raises these arguments for the first time on appeal, they
were not properly preserved for our review. See Tex. R. App. P. 33.1(a). Therefore,
we will not address them.

 We overrule Stevens's first and second points of error. 

B. Shackling

 In his third point of error, Stevens contends the trial court abused its
discretion by shackling him during trial. 

 The Fourteenth Amendment of the United States Constitution (5) and Article I,
Section 19 of the Texas Constitution (6) guarantee criminal defendants the right to a fair
trial. Wynn v. State, 219 S.W.3d 54, 59 (Tex. App.--Houston [1st Dist.] 2006, no
pet.) (citing Estelle v. Williams, 425 U.S. 501, 503, 96 S. Ct. 1691, 1692 (1976); Long
v. State, 823 S.W.2d 259, 282 (Tex. Crim. App. 1991). Three constituent elements
of this guarantee are directly implicated by the shackling of a criminal defendant
during trial proceedings. Wynn, 219 S.W.3d at 59. First, "the criminal process
presumes that the defendant is innocent until proven guilty." Id. A defendant who
is visibly shackled does not have the benefit of this bedrock presumption, and thus
his right to a fair trial is fundamentally compromised. Id. Second, "the Constitution,
in order to help the accused secure a meaningful defense, provides him with a right
to counsel." Id. The use of shackles may undermine this right by impeding a
defendant's ability to effectively communicate with his attorney. Id. Third, "[t]he
routine use of shackles in the presence of juries" compromises "[t]he courtroom's
formal dignity, which includes the respectful treatment of defendants, reflects the
importance of the matter at issue, guilt or innocence, and the gravity with which
Americans consider any deprivation of an individual's liberty through criminal
punishment." Id.

 For the reasons stated above, "[t]he law has long forbidden routine use of
visible shackles during the guilt phase" of a criminal defendant's trial. Id.; Long, 823
S.W.2d at 282. Despite this general rule, courts recognize that it may be necessary
for certain defendants to be restrained in exceptional circumstances. Wynn, 219
S.W.3d at 59 (citing Deck v. Missouri, 544 U.S. 622, 629, 125 S. Ct. 2007, 2012
(2005)). Such circumstances may arise, for instance, when a defendant has
demonstrated a propensity to escape or has threatened or assaulted courtroom
personnel, thereby implicating an essential state interest, namely, courtroom security. 
Id. Prior to the use of shackles, however, a trial court must make a specific finding
that they are necessary for reasons particular to a given case. Id. Trial courts may not
shackle defendants routinely, but only if there is a particular reason to do so. Id.;
Deck, 544 U.S. at 627, 125 S. Ct. at 2011.

 The use of restraints, such as shackles, cannot be justified based on general
appeal to the need for courtroom security or simple reference to the severity of the
charged offense. Wynn, 219 S.W.3d at 59; Long, 823 S.W.2d at 283. Rather, a trial
court must state with particularity its reasons for shackling a defendant. Wynn, 219
S.W.3d at 59; Long, 823 S.W.2d at 283. Such determinations are reviewed under an
abuse of discretion standard. Wynn, 219 S.W.3d at 60; Long, 823 S.W.2d at 282. 

 The day after voir dire, the following exchange occurred between the parties:

 Trial court: Why don't we get on the record outside the presence of the
jury regarding the shackling of the defendant in the
courtroom. It's my understanding that [defense counsel]
would like to object to that. 


 You may proceed.


 Defense counsel: Yes, Your Honor. I would like to object. I don't think I
did on the record [yesterday]. During voir dire my client
was shackled. He's again shackled today. We are starting
the guilt-innocence portion of the trial, and I object that
it's highly prejudicial, that if any of the jurors do happen to
see my client shackled, that it gives the impression that
he's a flight risk, that he is attempting to escape or that he's
dangerous in some way.


 Trial court: Do you want to respond?


 State: Yes, Judge. We would ask that the defendant remain
shackled. Just for the record, the defendant is here charged
with murder, has a prior aggravated assault conviction,
one, two, three, four, five theft convictions. In fact, his
criminal history shows two aggravated assault convictions,
as well as theft and trespass. He's had a number of
infractions while he's been incarcerated in the Harris
County Jail.

 

 Based on his history and based on the fact that he's
charged with murder and he's charged with beating a guy
to death, we ask that he remain shackled because he is a
danger. And for the record, the shackles are not in view of
the court. They are on his feet, and the jury can't see. 
You can't see them. The table--as I look at the table, you
can't see from the jury box his feet or any of the lower
portion of his body.


 Defense counsel: May I say one thing in response to that?


 Trial court: Yes.


 Defense counsel: For purposes of the record, it's my understanding that Mr.
Stevens' infractions in the jail are, one, tattooing himself
and, two, being intoxicated or being around an intoxicant. 
Neither one of those are violent. I believe he's been in jail
since 2005, so I don't think that he is dangerous.


 Trial court: I'm going to allow the shackles to remain. I do want the
record to reflect that they are on his ankles. He is seated at
counsel table, which there is a solid piece of wood going
from the top of the desk down to the floor that faces the
jury box. It is impossible for them to see the shackles
unless he sticks his feet out to show them.


 I will instruct my bailiffs not to move Mr. Stevens in front
of the jury. We will allow them to leave, and then we'll
move him back in the holdover ensuring that they won't
see them. Again, the only way they will is if he wants them
to.


 I agree that the two prior aggravated assault convictions
and the present charge for murder are compelling reasons;
but in addition, in a review of my file, I saw that he was
charged with another murder case in 1980 in Hawaii, that
his current range of punishment he's facing is 25 years to
life, and that self-mutilation involves using a sharp object
on your body. So, in light of all of those factors, I am
going to order that he remain shackled.

 In reviewing Stevens's challenge, we are mindful that a decision to apply
shackles to [a] defendant "must be subjected to close judicial scrutiny to determine
if there was an essential state interest furthered by compelling a defendant to wear
shackles." Wynn, 219 S.W.3d at 60 (citing United States v. Durham, 287 F.3d 1297,
1304 (11th Cir. 2002)). In determining whether the trial court abused its discretion,
each case must be evaluated on its own facts as reflected by the appellate record. Id.
(citing Culverhouse v. State, 755 S.W.2d 856, 860 (Tex. Crim. App. 1988)). 

 Here, the trial court apparently ordered Stevens shackled due to concerns over
courtroom security. Specifically, the trial court took into account Stevens's two prior
aggravated assault convictions, the fact that Stevens had been charged in two murder
cases, and that he had a jail infraction involving self-mutilation with a sharp object. 
We do not agree that these circumstances present a compelling case for shackling. 

 In Long, the Court of Criminal Appeals held that the trial court's findings in
the record did not support the judge's decision to have the defendant shackled during
trial. Long, 823 S.W.2d at 283. There, the defendant was charged with a "brutally
violent" capital murder but there was no other evidence in the record of violence or
threatened violence by appellant during the trial itself. Id. In holding that the trial
court abused its discretion in shackling the defendant, the Court of Criminal Appeals
concluded, "[t]he fact that a person is charged with the most serious of felonies
cannot override that person's constitutional presumption of innocence." Id.
(emphasis in original). Like the situation in Long, the trial court here justified the use
of shackles by a general appeal to the need for courtroom security and simple
reference to the severity of the charged offense. These justifications do not rise to the
level of particularity required by the Court of Criminal Appeals. See id. 
Additionally, we do not find Stevens's prior murder charge or the fact that he tattooed
himself while in jail to constitute the type of "exceptional circumstances" that would
justify restraint. Wynn, 219 S.W.3d at 59. Therefore, we hold that the trial court
abused its discretion in ordering Stevens shackled. See id. at 60; Long, 823 S.W.2d
at 282. 

 When it concludes that shackling was error, an appellate court must determine
whether the shackling constituted harmful error. See Tex. R. App. P. 44.2(a). 
Because the use of shackles implicates constitutional rights, an appellate court must
"reverse a judgment of conviction or punishment unless [it] determines beyond a
reasonable doubt that the [shackling] did not contribute to the conviction or
punishment." Wynn, 219 S.W.3d at 60. Shackling has principally been held to be
harmful error when the shackles are detectible to the jurors or when the use of
restraints unduly restricts a defendant's ability to communicate with counsel. Id. at
61. According to the Court of Criminal Appeals, all efforts should be undertaken to
prevent the jury from seeing the defendant in shackles, except when there has been
a showing of exceptional circumstances or a manifest need for such restraint. Long,
823 S.W.2d at 282; Wynn, 219 S.W.3d at 61. 

 In the instant case, the trial court noted that Stevens's shackles were not visible
to jurors and Stevens does not challenge that assessment. See, e.g., Masters v. State,
No. 14-06-00458-CR, 2007 WL 2034826 at *1 (Tex. App.--Houston [14th Dist.]
July 17, 2007, no pet.) (providing trial court's recitation that it would be impossible
for jury to see that defendant was leg-ironed if he kept his feet under table, and there
was no evidence that jury could or did see that defendant was leg-ironed). The Court
of Criminal Appeals and various courts of appeals have consistently held that, in the
absence of evidence that the jury actually saw the restraints, a defendant is not
harmed or prejudiced. See Canales v. State, 98 S.W.3d 690, 697-98 (Tex. Crim. App.
2003); Cooks v. State, 844 S.W.2d 697, 722-23 (Tex. Crim. App. 1992); Long, 823
S.W.2d at 282; Simms v. State, 127 S.W.3d 924, 929 (Tex. App.--Corpus Christi
2004, pet. ref'd); Ziolkowski v. State, 223 S.W.3d 640, 644 (Tex. App.--Texarkana
2003, pet. ref'd). Therefore, we conclude Stevens was not harmed as a result of being
shackled.

 We overrule Stevens's third point of error.

C. Prosecutorial Misconduct

 In his fourth point of error, Stevens contends that the prosecutor engaged in
misconduct by deliberately misstating the evidence. Specifically, Stevens complains
of the prosecutor's statement that Stevens "finished [Owens] off."

 During redirect examination of Sergeant Elliott, the investigating officer, the
following transpired: 

 State: And do you recall--you know, you've been asked
how you formed your opinion--the statement from
Mr. Stevens to Mr. Parmelee that, "I went ahead and
finished him off?"


 Elliott: Yes.


 Defense Counsel: Judge, I object. That statement is not in evidence or
any statement.


 State: Mr. Parmelee testified to it, for starters.


 Court: Overruled.


 To preserve error for prosecutorial misconduct, appellant must (1) make a
timely and specific objection; (2) request an instruction to disregard the matter
improperly placed before the jury; and (3) move for mistrial. See Tex. R. App. P.
33.1(a); Cook v. State, 858 S.W.2d 467, 473 (Tex. Crim. App. 1993). In the instant
case, Stevens did not object on the basis of prosecutorial misconduct, did not request
an instruction to disregard, and did not move for a mistrial. Therefore, Stevens has
not properly preserved his complaint on appeal, and we cannot consider it. See Tex.
R. App. P. 33.1.

 We overrule Stevens's fourth point of error.


D. Sufficiency of the Evidence

 In his fifth and sixth points of error, Stevens challenges the legal and factual
sufficiency of the evidence supporting his conviction. Specifically, Stevens claims
that the evidence indicates that Owens was killed by an automobile accident or by
Parmelee, rather than by the acts of Stevens. 

 1. Standard of Review

 a. Legal Sufficiency

 When an appellant challenges both the legal and factual sufficiency of the
evidence, we must first determine whether the evidence was legally sufficient to
support the verdict. Harmond v. State, 960 S.W.2d 404, 406 (Tex. App.--Houston
[1st Dist.] 1998, no pet.). When examining the legal sufficiency of the evidence,
appellate courts view the evidence in the light most favorable to the verdict to
determine whether any rational trier of fact could have found the essential elements
of the crime beyond a reasonable doubt. Poindexter v. State, 153 S.W.3d 402, 405
(Tex. Crim. App. 2005) (citing Jackson v. Virginia, 443 U.S. 307, 318-19, 99 S. Ct.
2781, 2788-89 (1979)). This standard concedes to appellate courts only a limited
role. Teer v. State, 923 S.W.2d 11, 17 (Tex. Crim. App. 1996). The inquiry does not
require a reviewing court to ask itself whether it believes that the evidence at the trial
established guilt beyond a reasonable doubt. Jackson, 443 U.S. at 318-19, 99 S. Ct.
at 2789. In this regard, the court is not to position itself as a thirteenth juror in
assessing the evidence. Narvaiz v. State, 840 S.W.2d 415, 423 (Tex. Crim. App.
1992) (stressing that appellate judges are not factfinders); Moreno v. State, 755
S.W.2d 866, 867 (Tex. Crim. App. 1988). Rather, the court is to position itself as a
final, due process safeguard, ensuring only the rationality of the factfinder. Moreno,
755 S.W.2d at 867. When faced with conflicting evidence, we presume the trier of
fact resolved conflicts in favor of the prevailing party. Turro v. State, 867 S.W.2d 43,
47 (Tex. Crim. App. 1993). Therefore, if any rational trier of fact could have found
the essential elements of the crime beyond a reasonable doubt, we must affirm. 
McDuff v. State, 939 S.W.2d 607, 614 (Tex. Crim. App. 1997).

 b. Factual Sufficiency

 When conducting a factual sufficiency review, we view all of the evidence in
a neutral light. Cain v. State, 958 S.W.2d 404, 408 (Tex. Crim. App. 1997). There
are two prongs to a factual sufficiency analysis. First, we must ask whether the
evidence introduced to support the verdict, although legally sufficient, is so weak that
the jury's verdict seems clearly wrong and manifestly unjust. Watson v. State, 204
S.W.3d 404, 414-15 (Tex. Crim. App. 2006) (quoting Johnson v. State, 23 S.W.3d 
1, 11 (Tex. Crim. App. 2000)). Second, we must ask whether, considering any
conflicting evidence, the jury's verdict, although legally sufficient, is nevertheless
against the great weight and preponderance of the evidence. Id. at 415. 

 During the course of the analysis, we are mindful that we must give appropriate
deference to the jury's findings in order to prevent intruding on the factfinder's role
as the sole judge of the weight and credibility of the evidence. See Marshall v. State,
210 S.W.3d 618, 625 (Tex. Crim. App. 2006); Johnson, 23 S.W.3d at 7. Therefore,
unless the record clearly reveals that a different result is appropriate, we must defer
to the jury's determination concerning what weight to give contradictory testimonial
evidence because resolution often turns on an evaluation of credibility and demeanor. 
See Marshall, 210 S.W.3d at 625. In other words, as the determiner of the credibility
of the witnesses, the jury may choose to believe all, some, or none of the testimony
presented. Cain, 958 S.W.2d at 407 n.5. In our review, we must also discuss the
evidence that, according to appellant, most undermines the jury's verdict. See Sims
v. State, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003). 

 2. Murder

 A person commits the offense of murder if he intentionally or knowingly
causes the death of an individual. Tex. Penal Code Ann. § 19.02(b)(1) (Vernon
2003). A person also commits murder if he intends to cause serious bodily injury and
commits an act clearly dangerous to human life that causes the death of an individual. 
Id. § 19.02(b)(2). In the present case, Stevens was charged by indictment with (1)
intentionally or knowingly causing the death of Owens by striking Owens with his
hand or foot or an unknown object, or (2) intending to cause serious bodily injury to
Owens and causing his death by intentionally or knowingly committing an act
seriously dangerous to human life, namely by striking Owens with his hand or foot
or an unknown object. 

 3. Analysis 

 Stevens argues that the evidence is legally and factually insufficient to support
the allegation in the indictment that Stevens intentionally or knowingly caused the
death of Owens. Initially, Stevens claims that he had no motive to commit murder,
while Parmelee did. Stevens points to inconsistencies in Parmelee's testimony and
claims that Parmelee gave implausible explanations for not calling the police
immediately during the beating incident. Stevens also asserts that the neck injury
Parmelee suffered the day of the incident could have been sustained during a struggle
with Owens.

 In a legal-sufficiency review, the jury is the exclusive judge of the credibility
of witnesses and the weight to be given their testimony. Jones v. State, 944 S.W.2d
642, 647 (Tex. Crim. App. 1996). Reconciliation of conflicts in the evidence is
within the exclusive province of the jury. Id. Therefore, it was the jury's prerogative
to resolve any apparent conflicts within Parmelee's testimony in the State's favor. 

 Viewing the evidence in the light most favorable to the verdict, we conclude
that a rational trier of fact could have found the essential elements of the offense of 
murder as to Stevens beyond a reasonable doubt. The evidence reflects that, from his
doorway, Parmelee saw Stevens lifting Owens over his head and slamming him into
the exposed root of a tree in Baird's front yard. Parmelee testified that he saw
Stevens repeat the action several times and then drop Owens on the ground and kick
and punch him while Owens was in the fetal position. Once Parmelee had returned
to the interior of his house, he saw a shadow pass by the window, presumably the
shadows of Stevens and Owens. Parmelee testified that two hours later Stevens
returned to the Baird home holding Owens's possessions in his bloody hands. 
Parmelee told the jury that Stevens said Owens had followed him around the corner
and that Stevens had knocked him out.

 Consistent with this scenario, Owens's body was found in a ditch not far from
Baird's home and Stevens's home. When the police found Owens, he was already
dead and had suffered numerous contusions from multiple blows, extensive internal
injuries, and bleeding in the brain.

 Additionally, upon executing the search warrant at Stevens's home, officers
recovered Owens's property and collected blue jean shorts which had blood on them. 
Officer Riddle testified that based on his training and experience, most of the
bloodstains on the shorts were transfer stains, which could have been transferred from
Stevens's hands to the shorts. Stevens's DNA was on the shorts and the testimony
revealed that Owens could not be excluded as the contributor to the minor component
of DNA mixture on the shorts. In light of this evidence, any rational trier of fact
could have concluded that Stevens murdered Owens.

 Alternatively, Stevens alleges that Owens could have sustained his injuries
from being hit by a car rather than by Stevens. In support of his theory, Stevens
points to evidence in the record that Owens was alive during the time in which he was
being beaten in Baird's front yard. Later, around 2:00 a.m., the people in the home
near the location where Owens was found heard a "thump." Stevens contends that
a car, not a person, would have made a thump. Stevens also notes that some of
Owens's injuries were consistent with those suffered in car accidents. 

 Contrary to Stevens's theory, both Officer Elliott and the assistant medical
examiner testified at trial that Owens's injuries were not consistent with an auto-pedestrian accident. Furthermore, there was no evidence of skid marks or tire marks
on the road or on Owens's clothing. 

 Given all the evidence in its entirety, we hold that that a rational jury could
have concluded beyond a reasonable doubt that it was Stevens who caused the death
of Owens and that he did so intentionally. Therefore, the evidence is legally
sufficient.

 For the same reasons given in our resolution of Stevens's legal sufficiency
claim, we also reject his factual sufficiency challenge. Again we note that the issue
of Parmelee's credibility is within the sole province of the jury in a factual-sufficiency review. Cain, 958 S.W.2d at 408. Moreover, there is no objective basis
in the record upon which we can conclude that the great weight and preponderance
of the evidence contradicts the jury's verdict. Watson, 204 S.W.3d at 417. Viewing
all of the evidence in a neutral light, we hold that the evidence showing that Stevens
intentionally caused the death of Owens is not so weak as to render the verdict clearly
wrong and manifestly unjust. See Johnson, 23 S.W.3d at 11. Therefore, the evidence
is factually sufficient to support Stevens's conviction.

 Because we hold that the evidence is legally and factually sufficient to support
Stevens's conviction for murder, we overrule Stevens's fifth and sixth points of error.

E. Ineffective Assistance of Counsel


 In his seventh point of error, Stevens contends he received ineffective
assistance of counsel at trial because his trial attorney: (1) failed to follow up on the
telephone message allegedly left by Baird with Stevens's private investigator, and (2)
failed to request a jury charge on the lesser-included offense of manslaughter.

 We review claims of ineffective assistance of counsel under the standard set
forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984). Under the
Strickland test, a defendant must prove (1) his trial counsel's representation was
deficient, and (2) the deficient performance was so serious that it deprived the
defendant of a fair trial. Id. at 687, 104 S. Ct. at 2064. To establish both prongs, the
defendant must prove by a preponderance of the evidence that counsel's
representation fell below the objective standard of prevailing professional norms, and
there is a reasonable probability that, but for counsel's deficiency, the result of the
proceeding would have been different. Id. at 690-94, 104 S. Ct. at 2066-68. A
defendant's failure to satisfy one prong makes it unnecessary for a court to consider
the other prong. Id. at 697, 104 S. Ct. at 2069. This test is applied to claims arising
under the Texas Constitution as well as those arising under the United States
Constitution. Hernandez v. State, 726 S.W.2d 53, 56-57 (Tex. Crim. App. 1986).

 Our review of defense counsel's performance is highly deferential, beginning
with the strong presumption that the attorney's actions were reasonably professional
and were motivated by sound trial strategy. Jackson v. State, 877 S.W.3d 768, 771
(Tex. Crim. App. 1994). When the record is silent as to trial counsel's strategy, we
will not conclude that defense counsel's assistance was ineffective unless the
challenged conduct was "'so outrageous that no competent attorney would have
engaged in it.'" Goodspeed v. State, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005)
(quoting Garcia v. State, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)).

 When considering the first prong of Strickland, we must decide whether there
is sufficient evidence in the record to refute the strong presumption that trial counsel
rendered adequate assistance and made all decisions in the exercise of reasonable 
professional judgment. Bone v. State, 77 S.W.3d 828, 835 (Tex. Crim. App. 2002). 
To this end, the Strickland standard requires Stevens to rebut the presumption of
adequate assistance by a preponderance of the evidence. See Hernandez v. State, 988
S.W.2d 770, 772 (Tex. Crim. App. 1999).

 1. Failure to Follow-up on Telephone Message

 Stevens alleges that trial counsel failed to adequately investigate because
counsel did not "follow-up with Ms. Baird who recanted her initial statement to the
police that Stevens was responsible and was now inculpating her own son." 
However, it was the responsibility of the investigative firm to follow-up on the
telephone call, not the responsibility of defense counsel. In fact, defense counsel
stated that the investigator who Baird allegedly called quit working for the firm and
she did not know "if it fell through the cracks or what." Therefore, defense counsel
may not have even known about the message left with the investigator in order to
follow-up with Baird prior to her death.

 Moreover, because Stevens did not file a motion for new trial, the record in the
present case is silent as to defense counsel's reasons for her actions. When there is
no motion for new trial hearing and the record is silent as to counsel's reasons for his
or her actions, an appellate court will not speculate as to counsel's trial strategy. 
Thompson v. State, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999); Jackson v. State, 877
S.W.2d 768, 770-71 (Tex. Crim. App. 1994); Gamble v. State, 916 S.W.2d 92, 93
(Tex. App.--Houston [1st Dist.] 1996, no pet.) Thus, Stevens has not rebutted the
strong presumption that trial counsel made all significant decisions in the exercise of
reasonable professional judgment. Based on the totality of this record, Stevens has
not established that trial counsel's performance fell below an objective standard of
reasonableness or that counsel's conduct was "so outrageous that no competent
attorney would have engaged in it." See Goodspeed, 187 S.W.3d at 392. Stevens,
therefore, has failed to satisfy the first prong of Strickland.

 2. Failure to Request Lesser-Included Charge on Manslaughter

 Stevens also asserts that defense counsel was ineffective for failing to request
a jury instruction on the lesser included offense of manslaughter. To establish his
claim that defense counsel's performance was deficient, Stevens must first show that
he was entitled to the instruction. See Fuentes v. State, 991 S.W.2d 267, 272 (Tex.
Crim. App. 1999).

 Under the Texas Code of Criminal Procedure, an offense is a lesser-included
offense if: (1) it is established by proof of the same or less than all the facts required
to establish the commission of the offense charged; (2) it differs from the offense
charged only in the respect that a less serious injury or risk of injury to the same
person, property, or public interest suffices to establish its commission; (3) it differs
from the offense charged only in the respect that a less culpable mental state suffices
to establish its commission; or (4) it consists of an attempt to commit the offense
charged or an otherwise included offense. Tex. Code Crim. Proc. Ann. art. 37.09
(Vernon 2006).

 We agree that manslaughter is a lesser included offense of the offense of
murder in the instant case. See Pierce v. State, 234 S.W.3d 265, 269 (Tex.
App.--Waco 2007, pet. ref'd) (citing Hall v. State, 225 S.W.3d 524, 535 (Tex. Crim.
App. 2007) (setting forth recent requirement that reviewing court must compare
statutory elements of murder as set out in indictment to elements of requested lesser
offense)). However, Stevens did not give defense counsel the opportunity to explain
her decisions because Stevens did not move for a new trial and request a hearing. In
the absence of a record of counsel's reasoning, we must generally presume that
Stevens's defense counsel had a plausible reason for her actions. Lumpkin v. State,
129 S.W.3d 659, 664 (Tex. App.--Houston [1st Dist.] 2004, pet. ref'd). 

 Furthermore, as the State correctly notes, defense counsel may have decided
not to ask for a jury instruction because counsel did not want the jury to consider
inconsistent defenses. Stevens's defensive theory was that Parmelee was the
individual responsible for the death of Owens. By not asking for an instruction on
the lesser-included offense of manslaughter, the jury could convict Stevens of murder
or find him not guilty. In the course of pursuing such an "all-or-nothing" strategy,
defense counsel does not act deficiently in failing to request a lesser-included offense
instruction. See Ex parte White, 160 S.W.3d 46, 55 (Tex. Crim. App. 2004). 
Therefore, we cannot conclude that defense counsel's decision not to request the
lesser-included offense of manslaughter was so outrageous that no competent attorney
would have engaged in it. See Goodspeed, 187 S.W.3d at 392; Bone, 77 S.W.3d at
833-34 n.13. Thus, Stevens has not rebutted the strong presumption that defense
counsel made all significant decisions in the exercise of reasonable professional
judgment and has again failed to satisfy the first prong of Strickland.

 We overrule Stevens's seventh points of error. 

 III. Conclusion


 Having overruled all of appellant's points of error on appeal, we affirm the
judgment of the trial court. 



 Bea Ann Smith

 Justice


Panel consists of Chief Justice Radack and Justices Higley and Smith. (7)


Do not publish. Tex. R. App. P. 47.2(b).

1. Baird died on September 21, 2006, before trial.
2. Jackie died before trial. 
3. Stevens did not testify at trial.
4. At the time of trial, Parmelee was serving time in the Texas Department of Criminal
Justice--Institutional Division for the felony offense of failing to register as a sex
offender.
5. U.S. Const. amend. XIV.
6. Tex. Const. art. I, §19.
7. The Honorable Bea Ann Smith, retired Justice, Third Court of Appeals, participating
by assignment.